The third case for argument this morning, Lexington Insurance v. Horace Mann. Mr. Rubin? May it please the court, my name is James Rubin and I represent Horace Mann Insurance Company. What I would like to do today is first address Horace Mann's dispute with Lexington. And then after I conclude my remarks about that, address Horace Mann's dispute with Ann. Horace Mann's dispute with Lexington concerns the issue of whether or not Horace Mann gave proper notice under the insurance policy. And I'd like to address two of the issues we argued in our briefs. First, whether Horace Mann gave proper notice under endorsement number 12, and then whether Horace Mann gave proper notice, actual notice, under the Illinois Supreme Court's Yorkville decision, such that Lexington could not deny coverage. The endorsement number 12 provides that Horace Mann shall give written notice as soon as practicable after the control group, which is defined in endorsement number 12, has knowledge of a claim that is either reserved for more than $500,000 or where Horace Mann itself has concluded that there is more than $500,000 in exposure. Recall, Your Honors, that Horace Mann retains the first $1 million of risk as its own retention, and therefore endorsement number 12 only requires claims to be notified to Lexington where Horace Mann has concluded the exposure is $500,000 or greater, and therefore Lexington should know about them. Under endorsement 12, then, Horace Mann must give written notice that it has knowledge of such a claim. It did four times during the month of March. It did first on March 14th in something called an extra-contractual liability claim report. It did second on March 24th twice. It sent one in the morning and one in the afternoon, two more extra-contractual liability claim reports. And then it gave written notice a fourth time on March 25th. Those four written notices should be considered in the context of the pre-existing written notice of a potential claim, which was given on January 11th, 2011, under Clause 9 of the policy. And under Clause 9, in order to give written notice of a potential claim, Horace Mann had to provide detailed information, which it did. The written notice in March should also be seen in the context of the fact that Horace Mann provided Lexington at Lexington's request with Horace Mann's entire claim file on February 16th, 2011. Then on March 7th, Horace Mann provided Lexington with verbal notice that a demand had been made in the amount of $17 million. Lexington's Mr. Burkholz concedes that he was aware that that $17 million demand was made on Horace Mann, and that's at A126 of the record. And so that demand, the notice of that demand that was given orally on March 7th, is reflected in Lexington's own claim notes, which are A49 through 53. Then on March 14th, Horace Mann sends the first of the extra-contractual liability reports to Lexington. Do you, if I may, without throwing you off, do you think that Mann was... Lexington's reservation letter actually referenced way back to September. It did, Your Honor. So do you think Mann's at a disadvantage arguing here when you are proceeding under the theory that Lexington's addressing, believing this is way back in September? No, Your Honor, because if one looks at the claim notes at A52, it is clear that on March 7th, Mr. Burkholz is told for the first time that there is now a demand for $17 million. And he testifies at trial, and that is at A126, that he realizes that that demand for $17 million, which is the first demand of a monetary sum, was made against Horace Mann. He then has enough information about that particular demand to advise, to opine, that the settlement value of the claim is $10 million. If one looks at the first extra-contractual liability report, which is at A6970, Horace Mann actually recounts the conversation that Mr. Burkholz had with Horace Mann, where he opined that the settlement value was $10 million or less. Then on March 24th, there is another environmental extra-contractual claim liability report, where Horace Mann discloses that it made the first offer to settle the claim of $3.1 million. That was actually made on the 23rd of March. Then again on March 24th, twice, they send two separate extra-contractual claim liability reports to Mr. Burkholz at Lexington. The one at the end of the day actually recounts that the underlying plaintiff, the injured party's lawyer, reduces demand from $17 million to $15 million, and that's at A83. It then explains that the negotiations took place during the course of the day, and the parties ended up with a demand of $8.5 million and an offer from Horace Mann of $7 million. The next day, March 25th, Mr. Burkholz at Lexington writes an email to Horace Mann and says, wait a second, I've read the extra-contractual liability reports. You do not have consent to settle unless you get written consent from Lexington, and by the way, I would like to become involved in the negotiations. So at that time, March 25th, Mr. Burkholz actually had sufficient information to actually volunteer to become involved in the negotiations. Horace Mann's Mr. Owsley writes back on the same day, on the same day at A87, and says, wait a second, you told me previously when you sent your reservation of rights letter and called me as a courtesy matter to tell me about it that you didn't have anything further to do with this claim and that settlement of the claim was entirely up to Horace Mann. Settlement of the claim. He also says, if you now want to become involved in the negotiations, give me a call on my cell phone, and he gives his cell phone number to Mr. Burkholz. And he says, but if you don't want to become involved in the negotiations, then let me know whether you have any disagreement with our negotiations, which are at $7.5 million. Mr. Burkholz then responds the same day, March 25th, at A85, and he says, if the matter settles for between $7.5 million and $8.5 million, we have no objection. That email also contains a very narrow reservation of rights. We do, however, reserve our right to say that the settlement is not an indemnifiable loss, which is a very narrow reservation. Under the policy, an indemnifiable loss is a wrongful act that is committed in the performance of professional services. That's not an issue in this case. So the reservation of rights in March 25 is of no effect and no relevance to this case. What instead is of relevance to the case is the fact that Lexington consented to the settlement on March 25th. So not only did Lexington get written notice four separate times during the month of March, it actually consented to the settlement. And because it got written notice and because it had all of that information, enough to opine on the settlement's value, enough to consent to settlement, it had written notice under endorsement number 12. Alternatively, even if for some reason the court were to decide, as Lexington argues, that Horstman was obligated to give written notice that the demand by the underlying plaintiff was in writing, which is not contained in endorsement number 12, then Horstman gave that on June 17th when it filed its counterclaim. Under the Yorkville decision, the Illinois Supreme Court's Yorkville decision, there was actual notice as a result of all of the written notices that were received and the conversations that took place during the month of March. The Illinois Supreme Court's Yorkville decision then says if you comply with technical notice, and here technical notice if Lexington was correct, that we had to inform them that the notice, the demand was in writing, that took place on June 17th and under Yorkville, that notice would be reasonable in time and because it would be reasonable in time, the burden shifts to Lexington to demonstrate that it was prejudiced by getting notice three months later. Lexington has not alleged prejudice, it has not offered any evidence in the record of prejudice, and therefore even under the actual notice doctrine, the alternative doctrine of which we argued in our briefs, this court should reverse the lower court, enter a judgment as a matter of law in Horstman's favor because Horstman satisfied the conditions of endorsement number 12 or alternatively provided actual notice in a timely fashion and there was no prejudice. Mr. Rubin, I don't want to cut you off on the merits argument, but I would like you to address the position of Lexington and Aon on the question of appellate review in Rule 50. In respect to Aon, Your Honor, our position is that there was sufficient evidence in the record, both factual and expert testimony, such that the court should not have taken the case away from the jury. There were two allegations made against Aon by Horstman, that it committed professional negligence because it gave improper advice and guidelines about the dangers of giving notice of a potential claim. It actually said that giving notice of a potential claim could result in losing coverage. Expert testimony by Mr. Cowan, Horstman's expert, said that that advice was wrong and indisputably wrong. No competent broker would give that advice. Mr. Marshall, who was Aon's expert, did not contradict that statement. So it is uncontested that the guidelines that were provided on whether to give notice were wrong. Then Horstman gave directions to Aon three separate times, on August 20th, August 23rd, and September 21st, and instructed them to give notice to Lexington. Mr. Gettleman, Aon's in-house lawyer, concedes that those notices, those directions to Aon, each contained sufficient information for any competent broker to understand that there was adequate information to satisfy Clause 9's requirements, that is, notice of a potential claim. It is, therefore, undisputed that the August 20th, August 23rd, and August and September 21st directions to Aon had sufficient information to go to Lexington and to inform Lexington of a notice of a potential claim. In each instance, Aon failed to give the instructions, failed to give the notice to Lexington that they had been instructed to give. Then what happened as a result of that is that Lexington didn't get notice of a potential claim. It then sued later on, claiming that there had been a claim in the prior policy period that had never been noticed. Had Aon followed the instructions that Horstman gave on three separate occasions in the prior policy period, that is, prior to September 28th, 2010, Lexington would have had notice of a potential claim. Any later claim that developed would have related back to that prior policy period. The litigation that was brought by Lexington, which Horstman had to defend, would have been unnecessary. And, therefore, there is not only negligence on the part of Horstman, but also proximate cause leading to the damages that Horstman incurred in defending that litigation that would have been unnecessary. For that reason, Your Honor, the district court improvidently took away from the jury the case of whether or not Aon was professionally negligent and whether or not that negligence proximately caused damages. There was sufficient evidence, both factual and expert testimony, to go to the jury on that subject. In respect to Lexington, we ask that the court enter as a matter of law judgment in Horstman's favor because there was written notice satisfying endorsement 12, or alternatively, there was actual notice and Lexington failed to prove that it was in any way prejudiced. Accordingly, Your Honor, we ask that the court reverse the district court in the case of Lexington and enter judgment in Horstman's favor in the case of Aon, remand the case for trial. Thank you, Mr. Rubin. Thank you, Your Honor. Mr. Collins? May it please the court. My name is Joe Collins and I represent the Appellee Lexington Insurance Company. I'd like to first address the Rule 50 question because in Lexington's view, this court is powerless to hear this appeal. Specifically, this court is powerless to direct the entry of judgment in Horstman's favor because Horstman failed to renew its Rule 50A motion following the court's judgment. As set forth in Lexington's red brief, the Supreme Court has repeatedly and unequivocally stated on multiple occasions, at least four, that the subject matter of a party's Rule 50 motion, its entitlement to judgment as a matter of law, cannot be heard by a reviewing court unless that motion is renewed under Rule 50B. The only argument by Horstman in response is that the procedural posture of this case is different because the court entered a directed verdict or judgment as a matter of law, that the case wasn't submitted to the jury for its own independent consideration of the facts and the evidence. That very same argument, however, was rejected by the Supreme Court in the Globe Liquor case, a case that was appealed from the Seventh Circuit, where the Seventh Circuit adopted the very same reasoning being urged by Horstman. And the Supreme Court unequivocally stated in the Globe Liquor case that there is no difference between a directed verdict and a jury verdict, none whatsoever. Under the Supreme Court ruling in Globe Liquors, this court is precluded from making the distinction urged by Horstman. I'd like to also talk about the Linden case. Horstman also cites the Linden case, which is an Eighth Circuit case, but the appellant in Linden didn't file any Rule 50 motion. The appellee filed a Rule 50 motion. And on appeal, the appellee argued that the appeal was improperly before the court because the appellant hadn't filed any Rule 50 motion whatsoever, Rule 50A motion or Rule 50B motion, based on unitherm. And the Eighth Circuit construed unitherm as holding that where a party fails to file a Rule 50B motion after a Rule 50A motion is denied, the court is powerless to hear the appeal, not where no Rule 50 motion was filed whatsoever. And there were certain issues in that case that did not require a Rule 50 motion, evidentiary errors, other objections made at trial. The Eighth Circuit doesn't cite Globe Liquor. No. But again, it's a different case. Yeah. And the appellee made a completely different argument, which is where if you file no Rule 50 motion, you can't have any appeal whatsoever. As Justice Thomas remarked in unitherm, the only error before the court for consideration is the error committed by Horace Mann. That is the failure to renew its Rule 50 motion. And while Horace Mann may deem that unfair, the Supreme Court has stated more than once that Rule 50B is grounded in considerations of fairness. Now, I would like to also talk about the underlying merits of the case to which we prevail at trial. The central issues in this case, which involved a claims-made policy, involved which claim was first made against Horace Mann. Horace Mann spoke about the March 3rd email. Lexington believed that there was a claim preceding that claim. And then there was an issue of whether Horace Mann notified Lexington of any such claim made during the policy. Lexington believed that the September 14th letter, September 14, 2010, which Horace Mann received on September 20, 2010, met both definitions of claim under the policy. The policy had two definitions of claim. There was a written demand for monetary damages, and there was also an ADR proceeding where monetary damages are being sought against the insured. In Lexington's view, that letter met both definitions. The letter was from the plaintiff's lawyer to the defense lawyer hired by Horace Mann to represent Horace Mann's insured, and that letter stated that the plaintiff's lawyer did not know who was handling the case on behalf of Horace Mann but asked the defense lawyer to send a message. The plaintiff's lawyer was not interested in the $25,000 policy limits. He said that he was going to talk about the extra-contractual aspects of the case at the mediation and that the only way the case was going to be settled was if Horace Mann acknowledged its extra-contractual exposure, didn't say future, its extra-contractual exposure, and opened its limits. It was essentially a demand to bring its checkbook to the mediation. Horace Mann did attend the mediation. Horace Mann brought its outside ECL counsel to the mediation, and contrary to what Mr. Rubin stated, there were previous settlement demands made in this case. At the mediation, there was a demand made for $6 million, I believe, and the counter by Horace Mann was $200,000. Extra-contractual money was offered, and that is at, I believe, A261 in the post-mediation report by Horace Mann's ECL counsel. Horace Mann also argues that the letter itself is not a mediation. The letter is not a claim because the letter is not a mediation. Well, no document is a mediation. It's a notice of mediation. Endorsement 12 of the policy specifically states that a claim is made against Horace Mann when notice of a claim is first received by Horace Mann. Therefore, when Horace Mann received notice of this letter, notice of this mediation, on September 20th, a claim was made against Horace Mann. That is policy language that Horace Mann never addressed once in this entire case, and that is why it meets the second definition of claim. Now, that letter doesn't demand a specific dollar amount. Many complaints do not demand a specific dollar amount. But as the cases we cite in our brief with similar factual circumstances, the courts have held, why else would a plaintiff's lawyer be writing to an insurance company asking to open its limits if he wasn't looking for money? And to construe that a claim has to be for a specific dollar amount would throw many complaints out of the context of a covered claim. In fact, there are certain jurisdictions where you can't specify a dollar amount. There are still claims. Now, Horace Mann believes that the only claim was the March 3rd email. And there's a lot of discussion in the brief about oral versus written notice. But the fact of the matter is that Lexington received neither. Lexington was never told that there was a written demand for monetary damages. Lexington was never told that there was a claim. And Horace Mann states in its briefs that it did not have to use the words written demand. Well, Horace Mann could have communicated that message in a number of ways. One, it could have told Lexington that a claim was made. It could have forwarded Lexington a copy of the March 3rd email. It could have told Lexington that a written demand for monetary damages was made. It could have told Lexington that a written demand for $17 million was made. Any of those would have sufficed. But Horace Mann did none of those. And Horace Mann was a public insurance company. He knew how to notice by a claim. Lexington disputes that Owsley told Burkholz there was a $17 million demand? No. There was no dispute that that conversation happened, but there was also no dispute. Both Owsley and Burkholz testified at trial that no one recalled there ever being a statement that the demand was in writing. And Mr. Burkholz testified that he felt that that demand was no different than the other settlement demands that had been ongoing throughout the case. He had no reason to believe that the demands converted into a formal claim. There was no evidence in the record, none whatsoever, that any conversation told Mr. Burkholz that there was a written demand. And, in fact, he testified that had he been told there was a written demand, a demand for $17 million, the first thing he would have done was ask for a copy of it. That would have set off alarm bells at the insurance company. Well, is it Lexington's position that Mann has to receive a written demand or that Lexington has to receive a written notification from Mann that there is a potential or there's a claim being made for an excess? The policy requires written notice of claims. From Mann to Lexington? Yes. Okay. And you can... So what difference does it make if Mann, if Burkholz didn't know that Mann had received this demand in writing, if it just requires Mann to notify Lexington in writing? Horstmann, yeah, there's two aspects of this. There's a lot of argument about written notice versus oral notice. Lexington took the position that there has to be written notice of a claim, and there was none. Mr. Rubin talked about these reports. In none of those reports is there a discussion about a written demand for $17 million. There's discussions about the settlement negotiations, but at no point was it specified that there was a written demand or a claim. Regarding verbal notice, we believe that verbal notice is not authorized under the policy, but even if it were, and it's not, we were never told verbally that there was a claim. We were never told verbally that there was a written demand for monetary damages. Lexington was verbally told, Mr. Burkholz was verbally told that there was a $17 million opening demand. He did not know it was in writing. He did not know that was a claim. And so as far as he knew, this was still a potential claim with ongoing settlement discussions. And to your point, during Mr. Rubin's questioning, Lexington had taken the position that the September 14th letter was a claim and sent a reservation of rights letter discussing that. Horstman never told Lexington that there had been a subsequent claim. Why do you think the court didn't give much? There wasn't much discussion about that, though, other than that it was laid out, but then the court just picked March 3rd, and everybody seemed to go with March 3rd. Judge Norgal decided at the summary judgment stage that he did not believe that the September 14th letter was a claim. He admonished the parties at trial not to relitigate that issue. It wasn't a final order, but we did not relitigate that issue. Lexington did file a Rule 50 motion, however, laying out the facts and evidence as to why it still believed that the September 14th letter was a claim outside the policy period. And if this court decides that our position is correct, you don't get to the March 3rd email. As to the March 3rd email, we do not dispute that it is a claim. We don't think it fits neatly in the box either. It talks about a discussion about a settlement offer made the night before, but we conceded it's a claim because a claim should be construed broadly. Because it does seem to me that your strongest position is if the September 14th, your position as to the September 14th letter is adopted. Because it eliminates all, I mean, there's no question you didn't receive notice until January. Right, right. And it was made, and the claim was made prior to the policy period, so notice actually became irrelevant because it was a claims-made policy. It has to be made and noticed in the policy period or a certain time thereafter. And this claim was made and received prior to the inception of the policy period. And that's been our position from the outset. Regarding the May 3rd email, that was a breach of contract action filed by Horace Mann. And Horace Mann bore the burden of persuasion on that case. They alleged a satisfaction of condition precedent and a breach. And we denied ever receiving notice. And those allegations state that they had given us notice of a claim prior to the settlement that the parties discussed settlement value after receiving notice. Mr. Rubin says that the counterclaim itself actually became notice of a claim. That is, the condition precedent was contemporaneously satisfied with the breach. They asserted satisfaction of condition precedent, breach, and bad faith all in one shot. And we denied ever receiving notice. And as we point out in the brief, that argument, the argument as to actual notice and a certain waiver argument were all made for the first time in opposition to summary judgment. We had been proceeding for four years on the allegation that Horace Mann had reported a claim to Horace Mann prior to settlement. And then that suddenly changed. And we argued, and the Seventh Circuit has a long list of cases saying you can't change your theory for the first time. And the theory became, forget the notice prior to the settlement. Four months after the fact, four months after we settled the case, consider our complaint notice of a claim. And that's a change of theory. That's a satisfaction of a different condition precedent. And Judge Norgel rejected the counterclaim argument. He did not address the other arguments. I do want to talk about actual notice because actual notice has only been addressed in the context of lawsuits. The rule is that if an insured tells an insurance company that a lawsuit has been filed against it and gives sufficient information for the insurance company to locate a copy of the suit, then the fact that the insurer didn't follow up with a letter or a copy of the complaint isn't fatal to coverage. It's never been extended to settlement negotiations. But even if it was and it hasn't, the problem is they don't meet the test because they would have had to have informed Lexington that a written demand was made or that a claim had been made against it. And the only argument Lexington would have was, well, you never followed up in writing or you never gave us a copy of it. Had Lexington then given that information, then, yes, Lexington could have asked Horseman for a copy of the email or asked Mr. Burley for a copy of the email. But those facts didn't happen. So even if you extend the actual notice doctrine to settlement negotiations, then it still doesn't work. Thank you. Thank you, Mr. Collins. Mr. Jones. May it please the Court, Your Honors. My name is Walter Jones, and I represent the Appellee A.I. And, of course, we would ask that Judge Norgal's finding be sustained. The very first thing I want to point out here is that the only complaint against A.I. is the third-party complaint that was filed in this case. It was filed on June 30, 2011, and it was the direct result of Lexington having filed a complaint for declaratory judgment. Now, in Lexington's complaint for declaratory judgment, they said, look, we're not going to indemnify you for three reasons. One, there's the September 14th letter that we say is a claim. Two, we're not going to indemnify you because you didn't tell us about the mediation. Number three, we're not going to indemnify you because you didn't tell us that there was a trial. Well, what happens here is, quite frankly, the arguments now proffered by Horace Mann's third-party complaint have been foreclosed by the district court's decision that a claim did not exist until March 3rd. Whatever went on in September and August in 2010 has nothing to do with the now, and this is exactly what they wanted. They wanted the March 3rd to be the claim. AON has nothing to do with that. In their third-party complaint, they allege that we stopped seeking your advice on January 11, 2011. So we had absolutely nothing, no negligence, anything to do with this letter of March 3rd. Now, despite the fact that they have pleaded themselves out of the picture with their third-party complaint, they still want to go further. Even though they haven't pleaded this, they got the judge to at least listen to them. And he says, well, look, here's their theory, that if somehow AON had filed a notice of potential claim in either August or September of 2010, that Lexington would not have bought its declaratory action in April of the next year. Well, I want to go through a couple of things. One, they claim we gave them improper advice. Well, I want to tell you, this whole improper argument, advice argument, this has been manufactured out of whole cloth. During the trial of this case, when I cross-examined their only witness, Narita Luttrell, she had to admit on the stand that she never had a single conversation with AON about this case. Not one conversation. So I said, if you never had a single conversation about this case, is it true then that everything you did with them is in an email? She says, absolutely, because I never had a conversation, either oral or in person, with them about this case. So needless to say, you've seen the emails. There's not one email in this case in which there is any advice given by AON that this notice of potential claim might not be filed. In fact, what is all the evidence in this case? Every time Mr. Duras was in contact with Ms. Luttrell, he said, we will file a notice of potential claim the moment you give us a copy of the complaint in this case. Because you remember when it's sent over in August, he doesn't even know what this case is about. It doesn't have a complaint. It doesn't have any pleadings. He says, look, but I will file the notice once you, in fact, give us a copy of the complaint. Now, this whole thing about improper advice is belied by, just take a look what happens. When they finally come to us on 9-24, she sends us an email that says, look, I have done some digging on my own. That's what the email says. We have decided that there's no extra contractual liability. We wish to withdraw the matter. It doesn't say anything about advice, about guidelines, or anything else. It is further belied by the fact when I cross-examined her on the stand, and she's asked, well, why did you withdraw this claim? She says, and incidentally, look at the whole quote, not the little truncated quote that they try to give you in their brief. She says, I withdrew the claim because I believed it was like another case. And I made the judgment on my own that we should withdraw it. And I said, cross-examiner, well, you made that judgment on your own. You didn't ask Ahon about this. He said, no, sir. As I said before, I never had a conversation with Ahon about this. And this whole nonsense about failing to follow instructions, this is ridiculous. If you take a look at the pleadings here, you will see from the moment that Duras gets this, he says, well, look, I don't want to follow the notice as soon as you give me a copy of the complaint. Then he asks her, he says, is that OK with you? He asks her three times, is it OK? Every time she comes back and she says, it is OK with me. And if you've got any doubt about this, Your Honor, why don't you take a look at my cross-examination of her. I said, isn't it a fact that you said on those three occasions that it was OK with you? Isn't it a fact that they followed your instructions? Her answer was yes. When I cross-examined their expert and I said, isn't it a fact that we followed the instructions, his answer on the record is yes. So this nonsense of improper advice and failing to follow instructions is absolutely wrong. Now, let's get to the proximate cause because that's an absolute hoot in this case. Their theory on this is that if somehow Aon had filed a notice of potential claim in either August or September, that Lexington would have opened up a claim file, that somehow Lexington would have found this September 14th letter. And by them finding the September 14th letter, they would have never brought a lawsuit against them. They even go further and say that if we filed a notice of potential claim, that somehow Lexington would have discovered that there was a mediation and that Lexington would have discovered that there was a trial date. Now, let me say this to you, Your Honor. There is not one shred of proof about that. Lexington never said that they wouldn't have filed the action. When I asked their expert, I said, now look, you're not trying to tell the ladies and gentlemen of the jury, are you, that somehow that September 14th letter would have been found, are you? And he says, no, sir. I'm not trying to say that because he wouldn't even buy into this. And let me tell you why he wouldn't buy into it. Because, as it turns out, the evidence in this case is not one of their witnesses would acknowledge that they ever even saw the September 14th letter until they were deposed. And what is extremely amusing about this whole thing is that the evidence is uncontradicted that they did everything in their power. It was them who kept the trial date, the mediation, and the September 14th letter away from both Lexington as well as A.I. Mr. Jones, was there anything in your contractual relationship with Mann that required you to be the exclusive provider of notice? Or could they have just done it themselves? Absolutely not. In fact, I want you to take a look at the very first page of the judge's decision where they insisted on introducing a contract that we all agree that we had these obligations. That contract says exclusive notice is their burden and not ours. And that's in that contract. And that was introduced into evidence. And the judge makes a big point about that in his district court findings. I don't think you have to go there when you take a look at all of this and how they pleaded themselves out of this with their own third party complaint. We just say to you, if you take a look at the entire evidence in this case, there's only one conclusion here. We ask that, for the reasons stated above, that the district court's grant of judgment be sustained as a matter of law. If there are no other questions, yes, Your Honor. Just a comment. I'm glad to see you haven't lost your talents as final arguments. Well, you hired me. No, I haven't. Thank you, Your Honor. Thank you, Mr. Jones. Mr. Rubin. Let me begin by Lexington. And I misunderstood the court's question in respect to 50B, I think. Yeah, I think that's critical. And Rule 50B, on its face, applies only if the district court does not grant a 50A motion. It's the very first line of Rule 50B. It only applies if the district court does not grant a 50A motion as a matter of law. In this case, the court, the district court, did grant a 50A motion. More than that, every case that is cited by the appellees for the proposition that you have to file a 50B motion when a 50A motion has already been granted involves where a jury verdict has been returned. A jury verdict is returned. The purpose of 50B is to enable the court to have a second review if either the jury has returned a verdict or if the jury is hung and does not return a verdict. That is the purpose of Rule 50B. In this case, the jury was never permitted to return a verdict or perhaps get hung because the court took away the case and it did grant a 50A motion. So on its face, it doesn't apply. None of the cases cited are cited involve a case where there's no jury verdict. 50B only applies where there's a jury verdict or a hung jury. It's a very simple proposition. If you read every one of the cases they cite, every one of the cases involves the return of a jury verdict. And so they've taken that argument completely out of context. As a matter of fact, their Globe argument is similar to the argument that was made in Linden and the court said you're taking out of context something the Supreme Court said in 1948. Second, the September 14th letter is not a claim. In order for it to be a claim, you have to look at it in the context of Endorsement 12. Endorsement 12, which is language, by the way, this is a policy that is written by Lexington. If you look at Endorsement 12, it is copyrighted by Chartis, Lexington's parent. Every page of the written policy is copyrighted. This is Lexington's policy. And Endorsement 12b says Horace Mann only has to give notice where the control group has knowledge of a claim where Horace Mann itself has concluded that the claim has a value of more than $500,000. The September 14th letter not only isn't to Horace Mann and talks about I'm going to have a future conversation about extra contractual liability. That is, it is at most a threat of something that might happen in the future. But most importantly, it actually doesn't have a monetary demand. And every case they cite not only is based on law other than Illinois for the proposition that the 914 letter is actually a claim, they're all outside of Illinois. But none of those cases involve something like Endorsement 12. Endorsement 12 has a condition that says Horace Mann itself has to value a claim at $500,000 before it has a reporting obligation. And therefore, not only is the September 14th letter as the district court found on summary judgment in 2013 not a claim, there's no monetary demand. It's not to Horace Mann. And the district court decision in Evanston says, which is a case that was decided under Illinois law, says that threats of future action do not constitute a claim. So the September 14th letter is not a claim. Then counsel confused an issue. There is a difference between whether Horace Mann actually provided written notice of a claim and whether Horace Mann provided written notice that the claim was in writing. Horace Mann absolutely did file written notice that there was a claim. It satisfied the stated conditions of Endorsement 12. What Lexington wants to do, what it wished it wrote in its policy in Endorsement 12, is that you actually have to provide not knowledge that Horace Mann knows of the claim, but you have to provide written notice that the claim is in writing. Endorsement 12 doesn't actually say that. They want to engraft a condition on top of Endorsement 12. And the Montholy case, an Illinois case, says that courts cannot engraft conditions that sophisticated companies like Lexington, who write their own policies, don't include. Next, Your Honor, not only have they engrafted, but clearly they did get written notice that the demand was in writing in the counterclaim. They got that notice on June 17th. For the first time, they, in an affirmative defense, filed in their answer at docket 29 at 14, raised the issue of insufficient notice. They raised it for the first time as an affirmative defense to the counterclaim. Horace Mann is not required to answer affirmative defenses under federal procedure, nor is it required to anticipate such affirmative defenses. And so Horace Mann was free to point out that the affirmative defense that they raised about insufficient notice was wrong, both on summary judgment and at trial and before this court, because they had actual notice under the Yorkville Doctrine. So Horace Mann's claim of actual notice is actually supported by Yorkville. The final thing about Yorkville is, they said, it only involves lawsuits. The actual case, though, the court's holding is broader than just lawsuits. The court at 939 NE 2nd at 296 actually quotes the McLaughlin case with approval. And it says, where the insurance company has actual notice of the loss or receives the necessary information from some other source, there is no prejudice to the insurer from the failure of the insurer to give notice of the claim. In other words, it extends not just to where there are lawsuits. The Yorkville case extends to notice cases, which is exactly what we have here. Lastly, I want to address briefly the Anne case. The counsel, I think, was a little bit imprecise with his statement that our expert and Ms. Luttrell said that Anne followed advice. The only statement either of them ever made was that Anne followed the September 24th instruction to withdraw the notice. And that's September 24th. The three prior instructions to give notice of the potential claim, August 20th, August 23rd, and September 21st, no one testified that those instructions were withdrawn. And our expert did testify, as well as Luttrell testified, that Anne failed to follow those instructions. And in addition, Luttrell testified that the only reason that she withdrew the September 24th, the fourth request that they give notice of a potential claim, the only reason she withdrew was that she had reviewed, and this is at A82, A182. What is that again? A182. And the second page is actually docket 517 at 757. So the entire quote is those two pages, 182 and then docket 517 at 757. Luttrell testifies, I reviewed the reporting guidelines, that is the guidelines that provided inaccurate information and wrong advice. She says, I reviewed the reporting guidelines that I had been provided, re-reviewed the notice of circumstance wording as to the disadvantages, and these are the guidelines, it actually uses the word disadvantages in the erroneous guidelines that are provided, of submitting a notice of circumstance and following that, subsequent to that conversation, the Drake report was withdrawn. So she says explicitly that she followed the written guidelines that had been provided by Anne in withdrawing the September 24th notice. And the guidelines are actually found at A97, and it actually says that you could lose coverage if you submit a notice of circumstance. So there is no question that the guidelines were incorrect, that the instructions on August 20th, 23rd, and 21st were not followed. Council made the statement also, thank you Your Honor, I will finish my sentence and I appreciate it, that they had requested a copy of the underlying complaint, Anne did. Well, the underlying complaint isn't actually required to file a notice of circumstance. If one looks at Clause 9, it says nothing about filing the underlying complaint. Moreover, on September 21st, Horseman provided Anne with the underlying complaint, Burleigh v. Drake, and they still failed to follow the instructions. Your Honor, therefore, we ask that this Court reverse the lower court, enter judgment on Lexington in our favor, and remand on Anne. Thank you. Thank you Mr. Rubin, thanks to all counsel.